Thank you, Judge Bianco, and may it please the Court. For decades, consumer wire transfers have been governed by the UCC, and other types of electronic transfers have been governed by EFTA. Now, for the first time, the decision below erases that line on the basis of a novel theory that is wrong. When Congress referred to a transfer of funds in this exclusion, it meant the entire transfer, from sender to recipient. That's what an ordinary speaker would mean. It's what the phrase means elsewhere in this very same provision. It is the only reading that makes any sense of the exclusion, and it's the only reading that respects Congress's decision to treat smaller-dollar types of electronic transfers from large-dollar wire transfers. I welcome the Court's questions, but otherwise, I'll go straight to the statutory text. And I think it's helpful to start with the general rule from which this is an exclusion, and that's 7. So 1693A, 7. It has the same language, transfer of funds, and it says that is initiated electronically. So we know the transfer is initiated electronically, but includes more than that. It includes multiple steps. And it gives examples. It includes direct deposits, ATM withdrawals, point-of-sale transfers. All of those are multi-step transactions, and the rule covers them end-to-end, and I don't take the Attorney General to dispute that. Mr. Wall, do you agree, or at least do we accept for purposes of the complaint, that the transaction can be broken into parts? The diagram included in the complaint shows that sort of first step is the payment order from the consumer to Citi. Do you agree? There are constituent steps, Judge Nathan. I don't think anybody disputes that. And that first step in a consumer-initiated wire transfer would include, tell me if you agree with this, movement or transfer of funds from the consumer's account to the bank's account. I think typically, yes. The consumer initiates a payment order, and then, as I understand it, the bank debits the consumer's account. And then there's a – That piece of the transfer, if you agree, can be broken into pieces. That piece doesn't take place over a Fed wire. That's right, Judge Nathan. It doesn't. So the whole question here is, when the exclusion in B says transfer of funds and then goes on to say made by a bank across Fed wire chips, is it talking about the whole transfer of funds, or is it talking about just each step? And my opening point to the Court was, in the rule a few lines above, it clearly means, based on the plain text, end-to-end, because it's a transfer which is initiated electronically, and then the four examples it gives are all multi-step. And I don't take the agency to dispute that EFTA covers them end-to-end. And then you have five exclusions. They use the same language, transfer of funds in E, transfer and transaction in A, C, and D. And there, it's all end-to-end. All of the other four exclusions are end-to-end. I don't take any – So which one of the others would you point to and say, if you break it down like that and you looked at it the way you're looking at here, it wouldn't be covered? Give me an example. I mean, take E, for instance. Any transfer of funds initiated by a telephone conversation, not pursuant to a prearranged plan and all the rest. All right? It's initiated by a telephone conversation, but there's a lot that has to happen after that for the transfer of funds to actually occur. It's a multi-step process just like here. I don't take anyone to be disputing that E excludes that entire transfer end-to-end, just like C excludes the sale of a security or a commodity, end-to-end. Same thing with A and D. So the rule in the exclusions – It's like all of the exclusions, maybe with the exception of the last, tend to cover sort of, you know, sophisticated, large entity, sophisticated transactions, not consumer-based transactions, which clearly is what the statute is aiming to protect. So, Judge Nathan, they say two things. I don't think either of them works. The first is, well, it's sophisticated entities. I mean, not necessarily E's not. C, if I just tell my broker to sell some stock, I mean, you know, is that sophisticated? I mean, I don't know. As financial instruments go, no. I hope your broker's sophisticated. Well, I mean, I mean only to say it picks up a lot of fairly commonplace transactions. And then they say, well, but it's face-to-face. I mean, it's meant to exclude things where you aren't dealing in person with somebody at the financial institution who can verify that it's you. And all of these exclusions deal with non-face-to-face. E is the closest. It's just a phone call. But it's still not face-to-face. So if you look at the legislative history and, you know, whether the Court looks at that or not, it's clear what Congress was doing. Everybody knew about wire transfers. They've been around since the 1800s in Western Union. And Congress said, well, we have a scheme to cover those. But we have newer stuff. Those are the examples listed in 7. And we want a scheme to pick up those. But we're taking out wire transfers. And, by the way, Judge Nathan, if you were sitting in Congress and you said, all right, how am I going to exempt wire transfers? And you said, what's a wire transfer? I made one a month ago to pay off my car lease. If somebody asked me, what is that? I would say it's a transfer my bank makes on my behalf across a wire service. And that's exactly how the exclusion is written. And points to the Attorney General for creativity to come in and say, oh, that's just the bank-to-bank part. But I don't think that's the natural reading of transfer of funds. But if Congress, at the time, when it's thinking about wire transfers and it's imagining essentially just that bank-to-bank piece, and to the extent that it's generally worrying about consumers, that's the overall purpose behind the Act, it imagines them engaging in wire transfers by walking into the bank and filling out a piece of paper. And so it's not covering what it understands as wire transfers and is a heavily regulated area. But it also anticipates technology to change. And so what happens then and how do you understand the statute, given that history, when wire transfers change such that you have individual consumers, like you did with your car payment, just going online and punching in a button as if you were sending, you know, a Venmo or other things? So three quick points, Judge Nielsen. The first is there is no contemporaneous evidence, and the AG has pointed to none, that Congress was worried about the bank-to-bank portion. All of the evidence suggests it was worried about consumer wire transfers writ large. Two. Well, worried about the bank-to-bank in the exclusion, I guess, right? Well, but what I'm saying is there is not a scintilla of evidence that Congress was worried that they were going to somehow pick up the bank-to-bank portion. That was going to be my second point. Because in A2, it says it has to be a debiting of an account used primarily for family or household or personal purposes. So if Congress had been sitting there worried about just the bank-to-bank portion, that would be an incredibly odd thing for it to have done because that bank-to-bank portion can't be picked up by the statute. And the AG has never made any persuasive response at that point. They excluded something that, by its terms, is not covered by the Act. This exclusion has never done any work, on their view, not from 1978 until now. And my third point is, Judge Nielsen, I do think they have a sort of fair point that now — Wouldn't that be true for some of the other exclusions? Some of the other exclusions wouldn't be covered as well? No. I don't think that's right, Judge Nielsen. The only thing they've pointed to is, A, the check guarantee service, which requires you to directly debit an account. And as we pointed out, the way those check guarantee services can work, they put like a temporary hold on funds on your account that then they lift once the check clears. And so the exclusion says, look, that temporary hold could otherwise be classified under the general rule of transfer of funds. It excludes that. Check guarantee services, hands off. All of these other exclusions do work. Only this one, on their view, doesn't apply end-to-end like the others and doesn't do any meaningful work. And my third point to your question, Judge Nathan, is I think they have gone — they have a point that now you can initiate these electronically. And, boy, doesn't that look to the consumer like an ACH transfer. And on its face, the statute treats ACH transfers differently. But that is an argument that voices on their side have made to Congress, including over the last couple of years. And Congress has declined to close what they say is the loophole. And this is essentially an attempt to achieve a public policy aim through a very creative and novel statutory interpretation. Congress thought these were different, and reasonably so. Wire transfers tend to be very big, and they were also not new and well understood in 1978. These other things were new, and they were small dollar, and Congress said we're going to treat them differently. They're welcome to go to Congress and say, look, that division doesn't make sense anymore. You need to take out the wire transfer exclusion. And they have, and Congress has declined to do that. But to come in and say that this exclusion, which everyone has understood for decades, covers wire transfers end-to-end, and to say, aha, only the bank-to-bank portion, A, it's not a natural meaning of the language, and B, it creates a massive superfluity problem. And not just on superfluity for the exclusion, but for Dodd-Frank, right? Dodd-Frank comes in and says, well, we want to cover the international wire remittances by vulnerable people, often migrants sending money back home to their families. That doesn't make any sense in their view. That's already covered by EFTA. Well, what if it does other things, right? So I think that's right, that remittances would have to be covered already under the State's theory. But it seems that it's expanding the set of statutory regulations with respect to remittances, addressing the problems around remittances specifically. Oh, it is certainly true that it does a bunch of stuff with remittances besides subjecting them to EFTA. And the only thing they say in their brief in a single sentence is, well, those operate independently. And that's true for some of it. But the part of it that excludes it, that enters it into EFTA, is entirely superfluous. Like, it doesn't have any point. And then the only thing that they don't say but one of their amici does is, well, but some of the remittances might not be initiated electronically. Okay. Then maybe it's not wholly superfluous, but Congress would have written it very differently. So your argument is if there's – even if it's – even if it does other things, if there's substantial overlap, the canon against superfluousness would say that can't be – that wouldn't be how Congress would have accomplished it. I think it – I think that's right. I would also say that it is – if you look at both what the agency did in the immediately implementing regulation in 2012 and all of the legislative history, I don't think there is any reasonable doubt that everyone understood to this process that they were taking something that had not been covered by EFTA and putting it under EFTA. And then the States had to move to amend Article 4A as a result for the reasons we explain in our brief. And through all of these debates in Congress, the rule that comes out in 2012, the debate that goes on in the States, there is not a hint that this was only about bank-to-bank. I mean, that view does not surface until a few years ago when the NYG files this complaint. Two courts have considered it since. Both have rejected it, including Judge Breyer in California, who I think did a nice job of looking at the text and saying, this is not a natural meaning of transfer of funds in this exclusion. And then, obviously, you have the superfluity problem, too. All right. Thank you, Mr. Wall. We'll hear from the State. May it please the Court, Esther Murdujeva for the Attorney General. The District Court correctly held that EFTA applies to electronic transfers that are initiated from consumer accounts preceding an interbank transfer. Before we get into the statutory text, I want to distill this very technical-seeming dispute to its consequences. In Citibank's view, Congress intended to treat consumers whose debit cards and PINs were stolen and used to make unauthorized ATM withdrawals differently from consumers whose mobile banking log-on information was stolen and used to make unauthorized wire transfers. That outcome is implausible, and it is not required by the text of EFTA. Why is it implausible if at the time it's that kind of fraudulent activity and that kind of electronic transfer just isn't a thing, and what is a thing is wire transfers, and Congress excluded bank-to-bank wire transfers? Your Honor, I think at the time that that EFTA was enacted, what Congress was worried about was the possibility that consumers who are not sophisticated would lose their entire life savings. But they were focused on new technology. They're focused on ATM machines and other technology that was emerging, but wire services have been around forever. So it would make sense for them to exempt wire services because that wasn't their focus. Well, wire services may have been around forever, but consumer-initiated wire transfers without any face-to-face interactions are a creature of the last 10 years. And if you had asked Congress in 1978 if Congress would have accepted the risk of consumers losing $100,000 in one fell swoop merely because that was done – Let's focus more on the statutory text. Sure. I can go back and forth on the policy issue, but isn't it a common understanding transfer of funds pursuant to wire services encompasses the entire end-to-end transaction? Nobody thinks of only the bank-to-bank portion of that, right? I disagree with that, Your Honor. I guess before we get into the – You say Bill was wiring funds to Sally. You think about just the bank-to-bank, or do you think Bill giving the money – making an order to his bank for it to transfer the money to her account and then she gets it? Isn't that the way we use the term? Not necessarily, Your Honor. And I think in – So to step back from the dispute between the parties about the meaning of the word transfer, I think it's helpful to highlight how EFTA actually functions once you've identified what the transfer is. So first you look to 1693A7 to determine whether a transfer is an electronic fund transfer. If it's not, you stop, and EFTA doesn't apply. If it is an electronic transfer, then a whole host of requirements under EFTA kick in, including disclosures and error correction. The statutory mechanism for capping consumer liability is limited to unauthorized fund transfers, which are defined separately in 812. But what about Mr. Wohl's argument that if you start with a definition, it says any transfer of funds and then refers to initiated through an electronic means? So, sure. By its reference, it's suggesting that there's something more than just one portion of it. I'm happy to walk through that definition. What the definition in A7 says is that electronic fund transfer means any transfer of funds initiated electronically so as to order, instruct, or authorize a financial institution to debit or credit an account. So Mr. Wohl is reading the word credit out of this. If I, in 1978, walked into a bank and said wire $1,000 to my brother in Alabama, the bank would take- I think he's focused on the word which is initiated through. That implies that it's encompassing more than just one stage when he uses the word transfer of funds. Isn't that a reasonable reading of that? I think only if you assume that the transfer that is being initiated is that first transfer. Again, to go back to my hypothetical, if I walk into the bank and I say wire $1,000 to my brother in Alabama and I give $1,000 to the bank, they will wire money from the bank account to my brother's bank with an instruction to credit my brother's bank account. That means an interbank wire transfer is initiated electronically. It can only be initiated electronically to be an interbank wire transfer. It is accompanied with an instruction to order, instruct, or authorize a financial institution. My brother's bank to credit his account. An interbank wire transfer would absolutely be an electronic fund transfer, absent the exclusion in B. What the exclusion in B does is exempt interbank wire transfers from the whole- The hypo you just gave would be exempted? The inter-correct. Yes, it would be exempted. So just a slight variation on that hypo. You walk into the bank. Instead of handing $1,000, you say take $1,000 from my account and transfer it to my brother. Is that exempted? The interbank transfer would be exempted. The oral instruction to debit $1,000 from my account would not qualify under EFTA because it's not initiated electronically. So effectively, no, right? I mean, to say part of it is, part of it isn't means no, it's not. Well, I guess I disagree with that, Your Honor, because I think under our theory of the case, the different transfers are distinct. EFTA uses the terms transfer and transaction to mean two different things. A transfer is- But you're saying, and I think at the time, Congress would have understood wire transfers to include, and it didn't happen frequently, consumers weren't making wire transfers, but if they were, they would go to the bank and they would say, transfer this amount of money, you fill out a piece of paper. I suppose you could have brought the money with you, but you could have also just said, take it out of my account. And you're saying that would, that portion of the take it out of my account would be not exempted, would not fall within the exclusion. I think there was ambiguity about whether that otherwise non-electronically initiated transfer from the oral instruction, whether it would become an electronic transfer by virtue of the interbank wire, because the interbank wire is an electronic transfer. There was- Can you address the superfluidity problem? I guess there's two separate ones. I think you agree, you can correct me if I'm wrong, that the bank-to-bank transfer is not covered by the Act to begin with. True or not? I disagree with that, Your Honor. Why did you tell the district court on page 21 of your opposition that it was technically redundant, that the exemption was technically redundant? I think the exemption is technically redundant under A12, which applies to unauthorized electronic fund transfers, which require the electronic fund transfer to be from a consumer's account. A7 does not require the transaction to debit only the consumer's account. It also applies if you're crediting a consumer account. So absent that exclusion in B, if I walk into my bank and say wire $1,000 to my brother, that's accompanied by, that wire will be accompanied by an instruction to credit my brother's consumer account. So absent that exclusion in B, the interbank wire transfer absolutely would be a wire transfer under A7. At a minimum, it's ambiguous. But I'm not frank. Even if it does other things, they didn't need to exempt the cross-border consumer wire transfers, right? They did, Your Honor, because, again, migrants were not using electronic mechanisms to initiate wire transfer, cross-border wire transfers in 2010. What was happening was people were bringing in checks or cash to a Western Union or to a bank saying, wire this to my brother in China, right? And then the wire would be carried out. Under the exemption, the interbank wire transfer would not be covered, nor would the migrant bringing in $1,000 in person and then saying, wire this. So the point of Dodd-Frank is to ensure, is actually to undo the exemption in B for cross-border remittances and to say that that interbank wire transfer is going to be covered by virtue of the text. You admit there's some redundancy even if it does other things. With respect to the cross-border remittances? Yes. I disagree, Your Honor. I think, again, in 2010, these sort of electronically initiated consumer wire transfers were simply not something that were in practice and certainly not something that was in practice by the people using cross-border remittances. I would also note that the section of EFTA that addresses cross-border remittances itself uses the terms transfer and transaction differently. What that indicates is that Congress, at least in this scheme, has always understood that these are two separate concepts. Now, if I may address the statutory purpose briefly. We haven't really talked about the fact that every government agency that has been charged with enforcing this statute, that they've never ever in 50 years brought an enforcement action for consumer wire transfer. So what significance does that have? I have three responses to that, Your Honor. The first is what I mentioned earlier. Consumer initiated electronic wire transfers are largely a creature of the last 10 years. This was simply not a product that was made available to consumers, except for the past 10 years. Second, most disputes between banks and consumers are governed through private arbitration. Again, the CFPB, that's a sentence from some guidance, from a commentary that the CFPB is providing. There is no agency. They weren't interpreting it the way you were. No, but there is no agency that has ever been asked to interpret this statute to the specific factual circumstances we have here, where a consumer is initiating a transfer from their phone and asked, does EFTA apply to this? And why haven't they done anything in the past 10 years? Well, to go back to what I was saying, most of these disputes between the consumers and the banks are handled through arbitration. We have no way of knowing whether consumers have raised this very same argument in arbitration or her arbitrators have pulled on it. Can I ask on the ‑‑ I wonder if the regulatory history is a little more complicated. I'm looking at from 1996, a quote from the Fed. If a financial institution makes a fund transfer to a consumer's account after receiving funds through Fed wire, the transfer by ACH is covered by the regulation, even though the Fed wire transfer is exempt. Exactly, Your Honor. That was going to be point three. Point three of my response is that regulation E itself envisions that the transaction, the end‑to‑end transaction that Mr. Wall refers to, is as a regulatory matter broken up into separate transactions, each of which can be regulated separately. Can I ask you to respond to Mr. Wall's point that that, like a point of sale, that would be true also. If you sort of broke up a point of sale, then you'd be facing the same problem. Maybe you're saying that's our next lawsuit. I don't know. No, Your Honor. I think that can be explained by the fact that Congress probably did not understand that point of sale transfers can be broken up in this way. I think in the legislative history, they talk about point of sale transfers as being kind of directly from the consumer account to the retailer's account. I think what makes more sense of this is automated teller machine transactions because there is a separate provision of FDATA that talks about automated machine transactions and said that checking your account balance is an electronic fund transfer, even though it does not result in the debiting of any money. So I think what Congress was trying to do was to be as inclusive as possible because, again, what Congress was worried about was people losing their entire savings. I strongly disagree with Mr. Wall that what Congress was concerned about was purely small value transactions. House Report at page 16. Financial harm from violations of this law could be catastrophic. Consumers could lose all of their funds as a result of unauthorized use through no fault of their own. It is just implausible to conclude that Congress was willing to accept that risk so long as an interbank wire transfer was included. It is also wrong to point to the $50 and $500 caps as somehow indicating that Congress thought it was regulating something trivial. If you adjust it for inflation, $50 is about $240 in today's money and $500 is $2,400. That's per transfer. The median American today has about $8,000 in their transaction savings accounts. That number was about $2,000 to $3,000 in 1979. It is just not true to think that Congress was trying to deal only with small value transactions. Congress was trying to protect the vulnerable American consumer who has very little money in these accounts, who would have life-altering consequences if all that money was swept away by electronic transfers. I see that I'm over time, but if I can take a moment. I think the answer to this is easy, but it's unbriefed. The causes of action are all State law causes of action, correct? Correct. And you're essentially incorporating the Federal law through it. So the subject matter jurisdiction is pursuant to Grable-Gunn? I think that's right. You think that's right? That is our position. And you may be aware there are some district – I don't think we've resolved – there are some district courts that have granted motions to remand for lack of subject matter jurisdiction when Federal law is invoked under the Executive Act. We need to assure ourselves of jurisdiction. Do you want to make an argument under Grable-Gunn? I do not, Your Honor. I'm happy to provide supplemental briefing if the Court thinks that that would be helpful. If I may just take a minute to address the S.H.I.E.L.D. Act issue. We ask that the Court reverse the dismissal of the OAD S.H.I.E.L.D. Act claim. Federal red flag regulations are designed to identify, detect, and respond to signs of possible identity theft. The S.H.I.E.L.D. Act claim is focused on the safeguarding of private data. Identity theft and data security are two separate considerations. Federal law recognizes this even for financial institutions. They have particular regulations under the red flag regulations for identity theft. Why didn't you file a cross-petition? Why should we even hear this issue? You could have filed a cross-petition under Rule 5 and you did not. Well, Your Honor, there is no requirement in this circuit to file a cross-petition on a 1292b. We oppose the 1292b application in the district court and here because we did not believe that this was an appropriate case for interlocutory appeal. The Court disagreed with us. We are here. And now that we are here, the Court has broad discretion. Why couldn't you do both? Why couldn't you file an opposition to theirs and say if you're going to hear this, we have our own petition? Why wouldn't you do that? Well, we tried that in the district court. What we said in the district court is if you grant the 1292b motion, please also certify our issues. And the district court said I'm not going to rule on that because what is certified is an entire order. We're a different court. I understand that, Your Honor. And we said in what we said in our opposition is if the court accepts review under 1292b, it should also hear OAG's Shield Act claim. There's nothing jurisdictional about it. This is in the Court's discretion. All right. Thank you. Thank you. All right. Mr. Wall, you have three minutes. Just a few quick points, Your Honors. First, at the time EFTA was passed, you could initiate a consumer wire transfer electronically, including by phone. It may have been less common than it is now, but it was not unknown to Congress. On the statutory piece, when I hear the Attorney General talk about slicing and dicing, all of the examples in the rule, ATM transactions, direct deposits, point-of-sale transfers, they're initiated electronically, but they're step-by-step. I think I heard counsel say, oh, no, those are covered end-to-end because we think Congress thought about them differently. So, too, in the exclusion. All the other exclusions are end-to-end. The general rule is end-to-end. There is no reason to treat this one of the five exclusions any differently. Say Congress wasn't worried about this. Congress was worried about drawing a policy balance. It didn't leave them unregulated. It said you have to have commercially reasonable procedures. And those have applied for decades to wire transfers, unlike other kinds of electronic transfers. But Congress said you had to have commercially reasonable procedures? They left them to Article IV, and Article IV requires. That's not Congress. Well, it was Congress's decision to leave it to Article IV, knowing that the States were likely to adopt that, as they all did. So I think fair, fair correction, Judge Nathan, to say Congress didn't adopt that  But Congress knew there was an existing scheme under Regulation J, and it knew that the ALI was looking at taking something like that and putting it in the UCC. And that happened, like, 11 years later or something like that? It was in the works at the time. It probably took longer than Congress thought, but it was still a deliberate decision to defer to that effort, which was started before EFTA, to be sure, took another decade to finish up and for the States to adopt it. But now it's been on the books for decades and decades. So it's a little hard, I think, to come in now and say, oh, we couldn't have foreseen any of this. We've lived under this for a long time. I still don't understand the superfluity response, because it is right that you have to debit or credit an account. But if you look at 2, a few lines above, it says an account established primarily for personal, family, or household purposes. When banks talk over that wire service, there is no crediting or debiting of anything other than the bank's own accounts at the Federal Reserve or through chips. There is nothing that involves any account that 2 would cover. That bank-to-bank portion has never, could never be picked up by the statute. I'm happy to talk about the other two claims, but I think the intra-blank bank claim is just an effort to end-run the wire transfer. If we're right that the wire transfer is excluded, they can't come in, point to the intra-bank transfer, and try to pick up the harm from the subsequent excluded transfer. They've got to focus on the harm from that transfer, and they haven't pleaded any harm from that transfer.  It says no benefit, right? Well, it says no benefit under the statute. What benefit to the consumer in the intra-bank transfer? The credit to their account. But I was focusing, Judge Nathan, on our second argument, which is even if you think there's no benefit, notwithstanding the credit, and it is an unauthorized fund transfer under the statute, they still have to show damages from the transfer in order to recover. Damages is a question down the road, presumably, on the claims if the district court's affirmed. Why wouldn't we just affirm by saying there's, on that count, by saying no benefit? Because the language is no benefit to the consumer. It's not account by account. It's no benefit to the consumer. And that seems obvious. I mean, there may be harm from lost interest or the like, but what benefit to the consumer if the total account amounts are the same at the end of the day? Right. There's two requirements there under 12 for the unauthorized transfer. It has to be initiated by somebody other than the consumer without authority and no benefit. So I don't want to collapse the two just, Nathan. When you say what's the benefit, imagine I authorized the intrabank transfer or any consumer did, and then we ask is there a benefit. The obvious benefit would be that you got the credit in the account from the intrabank transfer. That doesn't change when it's unauthorized, right? It changes the first piece. Well, what's the benefit? The benefit is the credit to the new account. You have the funds in the new account. The benefit to the accounts is benefit to the consumer. What benefit has the consumer gained from moving a certain number of dollars from one account into another? Well, the consumer obviously hasn't moved it. That's the first problem. It wasn't authorized. Okay. But the benefit, you know, objectively understood is the credit in the new account from the transfer. And my point about harm was just if you look at the decisions in Day and Vitalis that are in our brief, what the court said was, look, whatever the benefit question, you're trying to piggyback and say your injury from that, the harm that you're claiming, all has to do with the subsequent transfer. And you can't fold that into the intrabank claim. And I think that's equally true here. And on the Shield Act claim, I think the Court's right. It shouldn't reach it. They haven't even tried to show exceptional circumstances. And on the merits, Judge Etkin got this exactly right. If you look at page 55 of our brief and page 15 of the JA, the language that they use in their complaint maps on almost identically to the relevant portion of the red flag rule. It is the same verbs. It is the same language. Real quick on subject matter jurisdiction. I mean, the whole dispute here is over the meaning of a Federal statute. So I think if there were, you know, if there's a Grable case, it sure seems to me like one. But that's the argument, that it's under Grable and Gunn. I think that's right. It's either distinguishable or the district court cases that were manned sort of comparable. Not this Federal statute.  But other Federal statutes sort of brought under executive law, whatever the number is, causes of action. They're either distinguishable or wrong under Grable. Is that? Judge Nathan, I haven't looked at those cases. Like the State, I'd be happy to submit a subliminal briefing on that. All right, thank you. Can I ask you to educate me a bit? The Judge Etkin's opinion did a lot to educate all of us, I admit. Regulation J, what exactly do you make of that? A funds transfer could be carried out in part through Fedwire and in part other means that is subject to the Electronic Fund Transfer Act. What do we make of this? What's the significance of this in your view? Yeah, Judge Kovanec, I have studied this language many times, and here is what I really think it means, although I will say that it is not an exercise in clarity. And I think Judge Nathan pointed to the same 1996 language. I think what they are saying there is, look, let's say you have a telephone transfer agreement. That's covered by Article 4A, 402A. And then they say, but you can have these sort of hybrid transfers. And I think the example I would give you is, I'm an employer. I wire money to my payroll processor, and then the payroll processor uses ACH transfers to pass that money out to my employees. And I think what the Fed is saying there in Regulation J is, if you have both, you have two different kinds of transfers back-to-back. One that's a wire and has completed sender-to-recipient, because I'm sending to my payroll processor, not my employees. That wire transfer is completed. And then you have a separate ACH transfer from a new sender to a new recipient. You can have two regimes that apply back-to-back. What the Fed is not saying is that you can slice and dice these transfers up into little constituent pieces and then make the different regimes cover them. And if that's what the Fed had meant, boy, I think we'd find some evidence between 1996 and 2020-something when they filed the complaint that that is the way any federal regulator understands either of these schemes. And there is literally nothing. All right. Thank you. Thank you both for observing the session. Have a good day.